IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

RONALD L. MCINTOSH,

          Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

          Defendant.
_____

CV-06-933-PK

AMENDED[1] OPINION AND
ORDER OF REMAND

PAPAK, Magistrate Judge:

## INTRODUCTION

Plaintiff Ronald McIntosh brings this action for judicial review of a final decision of the

Commissioner of Social Security denying his application for disability insurance benefits (DIB)

---

[1]The amendments made are as follows: (1) the title of the document was changed from "Opinion and Order" to "Opinion and Order of Remand," and (2) on page 2, the date that the ALJ found McIntosh satisfied the insured status requirements for a claim under Title II was changed from December 31, 1996, to May 17, 2005.

1 - AMENDED OPINION AND ORDER OF REMAND

under Title II of the Social Security Act. The court has jurisdiction under 42 U.S.C. § 405(g). For the reasons discussed below, the Commissioner's decision is reversed and remanded for the calculation and award of benefits.

## BACKGROUND

McIntosh was born January 21, 1953. Tr. 115.[2] He earned a general equivalency diploma (GED) and served in the military from 1970 to 1973. Tr. 119, 147. McIntosh was in combat in Vietnam as part of a helicopter medical team. Tr. 256. He later completed training and certification as an airframe mechanic. Tr. 147. McIntosh has past work as an aircraft mechanic, director of aircraft maintenance, and a truck driver. Tr. 173. McIntosh alleges disability due to depression, post traumatic stress disorder (PTSD), chronic low back pain, and, recently, lung cancer.

He filed for disability on February 12, 2002, alleging onset of disability from July 10, 2001. His application was denied initially and on reconsideration. A hearing was held before an Administrative Law Judge (ALJ) on December 18, 2003. The ALJ found McIntosh satisfied the insured status requirements for a claim under Title II through May 17, 2005. McIntosh must establish, therefore, that he was disabled on or before that date to prevail on his DIB claim. 42 U.S.C. § 423(a)(1)(A). *See Tidwell v. Apfel,* 161 F.3d 599, 601 (9th Cir. 1998). The ALJ issued an opinion on January 20, 2004, finding McIntosh not disabled. This decision was vacated by the Appeals Council and remanded back to the ALJ for reconsideration of McIntosh's mental impairments, including PTSD, his subjective complaints, and his credibility. Tr. 101-102.

---

[2] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed with the Commissioner's Answer.

A second hearing was held on February 3, 2005. The ALJ issued an opinion on May 17, 2005, again finding McIntosh not disabled. The Appeals Council denied McIntosh's request for review, making the ALJ's decision of May 17, 2005, the final order of the agency, from which McIntosh now appeals to this court.

## **DISABILITY ANALYSIS**

The initial burden of proof rests upon the claimant to establish disability. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995). To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. § 423(d)(1)(A).

The Commissioner has established a sequential process of up to five steps for determining whether a person over the age of 18 is disabled within the meaning of the Act. 20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). At step one, the Commissioner determines whether the claimant has performed substantial gainful employment since the date alleged as the onset of disability. At step two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. An impairment is severe if it significantly limits the claimant's ability to perform basic work activities. 20 C.F.R. § 404.1521. The burden to show a medically determinable severe impairment is on the claimant. *Bowen v. Yuckert*, 482 U.S. at 146.

At step three, there is a conclusive presumption that the claimant is disabled if the Commissioner determines that the claimant's impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful

activity." *Id.* at 141; 20 C.F.R. § 404.1520(d). The criteria for these listed impairments are enumerated in 20 C.F.R. pt. 404, subpt. P, App. 1 (Listing of Impairments).

If the adjudication proceeds beyond step three, the Commissioner must assess the claimant's residual functional capacity (RFC). The claimant's RFC is an assessment of the sustained work-related activities the claimant can still do on a regular and continuing basis, despite the limitations imposed by his impairments. 20 C.F.R. § 404.1545; Social Security Ruling (SSR) 96-8p.

At step four, the Commissioner must determine whether the claimant retains the RFC to perform work he has done in the past. If the ALJ determines that he retains the ability to perform his past work, the Commissioner will find the claimant not disabled. 20 C.F.R. § 404.1520(f).

At step five, the Commissioner must determine whether the claimant can perform work that exists in the national economy. *Bowen v. Yuckert*, 482 U.S. at 142; 20 C.F.R. § 404.1520(e), (g). Here the burden shifts to the Commissioner to show that a significant number of jobs exist in the national economy that the claimant can do. *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999). If the Commissioner meets this burden, then the claimant is not disabled. *Id.,* 20 C.F.R. § 404.1566.

## THE ALJ's FINDINGS

At step one, the ALJ found that McIntosh had not engaged in substantial gainful activity since his alleged disability onset date of July 10, 2001. Tr. 37. The ALJ found McIntosh's "Dysthymia with features of posttraumatic stress disorder" severe at step two. Tr. 23. He also found the "record reflects his alleged impairments of 'daily headaches, chronic low back pain, transient ischemic attack and lung cancer' are non-severe." Tr. 37. The ALJ found McIntosh's impairments, singly or in combination, did not meet or equal the criteria for a listed impairment enumerated in 20 C.F.R. pt. 404, subpt. P, App. 1. *Id.* He found McIntosh retained the RFC to perform "unlimited

physical exertion with a vocational non-exertional limitation restricting him to no more than 'occasional' interaction with co-workers and the general public, preferably with only one source of supervision." Tr. 35.

The ALJ elicited testimony at the hearing from an impartial vocational expert (VE). Tr. 1033-1036. At step four, the ALJ agreed with the VE that McIntosh could not perform his past relevant work. Tr. 36. The ALJ asked the VE whether an individual of McIntosh's age, education, experience, and RFC could perform work that exists in significant numbers in the national economy. The VE responded the individual could perform work as a motel cleaner, janitor and hand packager. Tr. 1034-1035. The ALJ determined McIntosh could make a successful adjustment to work that exists in significant numbers in the national economy and was not disabled within the meaning of the Social Security Act. Tr. 37.

## STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. *Batson v. Commissioner of Soc. Sec. Admin.,* 359 F.3d 1190, 1193 (9th Cir. 2004). "Substantial evidence means . . . such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).

The ALJ is responsible for "determining credibility, resolving conflicts in the medical testimony and resolving ambiguities." *Edlund v. Massanari,* 253 F.3d 1152, 1156 (9th Cir. 2001)(citations omitted). The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986). If the evidence can reasonably support either affirming or reversing the Commissioner's conclusion, the court may not substitute its judgment for that of the Commissioner. *Batson v. Commissioner of Soc.*

5 - AMENDED OPINION AND ORDER OF REMAND

*Sec. Admin.*, 359 F.3d at 1193. However, the court may set aside a denial of benefits "when the ALJ's findings are based on legal error or are not supported by the record as a whole." *Tackett v. Apfel,* 180 F.3d at 1097.

## DISCUSSION

McIntosh alleges the ALJ improperly assessed the opinions of his treating and examining healthcare providers and the severity of his symptoms. He also alleges the ALJ failed to provide adequate reasons for discounting his disability rating by the Department of Veterans Affairs (VA). McIntosh further alleges the ALJ improperly assessed his credibility and the testimony of lay witnesses. He contends that based on the foregoing errors, ALJ crafted an inappropriate RFC which resulted in the erroneous conclusion at step five that McIntosh could perform other work existing in significant numbers in the regional and national economy.

## I. Medical Background

McIntosh received group counseling services in 1984 through the VA Medical Center in Nebraska. Tr. 214-224. He was diagnosed at that time with Post Traumatic Stress Disorder (PTSD), Delayed. Tr. 224. Records from the Portland VA Medical Center (VAMC) indicate McIntosh began treatment at the Headache Clinic in 1999 for cluster headaches and was prescribed oxygen, cafergot, and verapamil. Tr. 251-253. He was noted to have been treated for PTSD within the past year and so "PTSD screening not required." Tr. 252. However, depression screening was required as McIntosh had not been previously treated for depression. *Id.* VAMC records from 2000 and 2001 indicate treatment for PTSD, depression, low back pain, cluster headaches, and gastroesophageal reflux disease (GERD). Tr. 236-248.

Dr. Huang, McIntosh's primary care physician at the VAMC, recommended counseling in June 2001, following the death of McIntosh's father. Tr. 236-237. McIntosh sought counseling

services at the Veterans Center in July 2001. Tr. 316-322. He was assessed as having chronic severe PTSD, with symptoms of alienation, intrusive memories of Vietnam, anger, problems dealing with authority, emotional numbing and arousal. Tr. 322. In November 2001, Dr. Huang noted McIntosh's cluster headaches were controlled with oxygen therapy and cafergot; and he was taking amitriptyline for back pain. Tr. 229-232. His alcohol screen was negative. Dr. Huang also noted increased depression and prescribed the anti-depressant citalopram and referred him to mental health services. *Id.*

Dr. Monkarsh, a VAMC psychologist, evaluated McIntosh on December 4, 2001, to assess whether he was eligible for an increase in service-connected disability. Tr. 227-228. Dr. Monkarsh noted McIntosh had a 50% service-connected disability rating for Dysthymic Disorder and past diagnoses by VA psychiatrists of Dysthymic Disorder, Depressive Neurosis, Chronic Depression, Major Depressive Disorder, and possible PTSD. Tr. 227. He noted many of McIntosh's symptoms were consistent with PTSD and recommended he apply for a formal PTSD evaluation. Dr. Monkarsh found McIntosh suffered from severe social, industrial, and emotional impairment as a result of Dysthymic Disorder and possible PTSD, to be evaluated. He assigned McIntosh a Global Assessment of Functioning (GAF) of 41-45.[3] Tr. 228.

McIntosh continued to receive treatment in 2002 at the VAMC for cluster headaches and depression. Tr. 296-300, 355-380. On May 17, 2002, Karen Inaba, a psychiatric mental health nurse practitioner (PMHNP) assessed McIntosh for mental health services. Tr. 291-295. She noted

---

[3] The GAF is a scale from 1-100, in ten point increments, that is used by clinicians to determine the individual's overall functioning. A GAF of 41 to 50 indicates serious symptoms (suicidal ideation, severe obsessional rituals frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job). The American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV), 34 (4th ed. 2000).

increased depression, low motivation and energy, intrusive memories from Vietnam, hyper startle response, irritability, moodiness, and that he slept with a loaded gun. She diagnosed PTSD, child and combat, Major Depressive Disorder, and Dysthymic Disorder. She assigned a GAF of 50, increased his dosage of citalopram, and referred him to PTSD classes. Her assessment was co-signed by Dr. Huang. Tr. 295.

Dr. Wood, a state agency consultant, examined McIntosh on May 21, 2002. He diagnosed Major Depressive Disorder, recurrent, moderate to severe, Rule Out PTSD, and alcohol and cannabis abuse in remission. Tr. 255-258. Dr. LeBray, a state agency consultant, completed a Psychiatric Review Technique (PRT) form and Mental Residual Functioning Capacity (MRFC) on June 11, 2002. Dr. LeBray noted McIntosh had moderate limits in getting along with co-workers and a limitation of one supervisor would be desirable. He limited McIntosh to only occasional contact with peers, the public and a supervisor. Dr. LeBray noted McIntosh would not be able to respond to changes in the work setting and hazzards. Tr. 260-263. Dr. LeBray determined McIntosh had an Affective Disorder with moderate difficulty in social functioning. Tr. 265-278.

McIntosh continued treatment at the VAMC for depression, PTSD, and cluster headaches. Tr. 284-287. He was treated in September 2002, for dizziness, headaches that were not cluster type, neck pain, back pain, depression, and panic attacks. Tr. 384-389. McIntosh complained of "small blackouts, like strobe light flashes" with head pain. Tr. 853. He continued receiving treatment for Major Depressive Disorder and PTSD through 2002. Tr. 396.

In October 2002, the VA determined McIntosh qualified for an increase in service-connected disability from 50 to 70 percent for Dysthymic Disorder, effective from August 27, 2001. Tr. 119-122. The VA also determined McIntosh was entitled to individual unemployability benefits, stating, "We have concluded the evidence is sufficient to conclude you likely are unemployable because of

8 - AMENDED OPINION AND ORDER OF REMAND

your service connected Dysthymia shown as severe. We are granting the benefit effective August 27, 2001, the date your evaluation is retroactively increased to 70 percent." Tr. 120. The VA informed McIntosh by letter that he was assigned a permanent 100 percent disability evaluation because he was unable to work due to his service-connected disability. Tr. 124.

McIntosh had a pulmonary function test at VAMC in March 2003, and was given a provisional diagnosis of Chronic Obstructive Pulmonary Disease (COPD). Tr. 399. He was switched from citalopram to mitrazapine due to side effects, had spinal x-rays, and was referred to vocational rehabilitation services. Tr. 421, 431. Dr. Malkoski, a VAMC physician, noted in March 2003, that McIntosh's spinal x-rays showed scoliosis of the lumbar spine with degenerative disc changes at L3-4 through L5-SI. Tr. 413-415. He also noted McIntosh had headaches, depression, PTSD, night sweats, troubled sleep, leg pain, loss of appetite and weight loss. Tr. 415. He ordered further tests and a CT scan showed a right lower lung nodule, indeterminate in nature. Tr. 428. McIntosh started smoking cessation classes and continued treatment for back pain, depression, PTSD, and headaches. Tr. 411-412, 452, 454, 878, 889.

Dr. Nelson treated McIntosh for back pain radiating to the hip in September 2003, and noted it was likely due to degenerative disc disease as indicated by x-ray. He recommended continued medication and exercise. Tr. 454. Dr. Nelson prescribed vicodin for McIntosh's degenerative disc disease in March 2004, and ordered nerve EMG studies. Tr. 521-525. Dr. Niles noted the EMG studies were abnormal but non-diagnostic and could indicate a "recurrent local injury such as ankle sprain, dysvascular injury, or lumbar root or spinal stenosis injury." Tr. 521.

In September 2003, McIntosh was given a prescription for the anti-depressant bupropion in addition to mitrazapine. Tr. 454, 531. He was also encouraged to continue his PTSD group therapy

at the Vet Center, and return to PTSD classes. McIntosh continued treatment at VAMC for depression and PTSD through January 2005. Tr. 519-520, 531, 607-608, 863-864.

Dr. Wood conducted another psychological examination of McIntosh for the state agency on July 14, 2004. Tr. 765-768. He diagnosed PTSD, and Major Depressive Disorder, recurrent, moderate to severe. Tr. 768. Dr. Wood stated the level of depression was difficult to assess without corroboration and he noted McIntosh used cannabis with his weekly PTSD group members. Tr. 766, 768. In August 2004, Dr. LeBray, a state agency consultant, developed another Mental Residual Functional Capacity Assessment (MRFC). He noted depression and PTSD and assessed moderate limitations in understanding, remembering and following detailed instructions; working in coordination or proximity with co-workers; interacting appropriately with the general public; accepting instructions and criticism from supervisors; and getting along with co-workers and peers without distracting them or exhibiting behavioral extremes. He recommended simple tasks, only occasional (brief and superficial) contact with co-workers and the general public; and direct supervision from one understanding supervisor. Tr. 918-920.

McIntosh was treated at VAMC for dizziness, headaches, and sudden onset vertical diplopia in August 2004. An MRI was ordered to determine if McIntosh had a stroke or transient ischemic attack. Tr. 498-499. Dr. Nelson noted the MRI findings were negative for acute infarct, and the left-sided clustered foci of white matter abnormalities suggested "white matter infarcts of uncertain chronology, rather than small vessel ischemic change." Tr. 616. He noted the dizziness could be related to medications and referred him to mental health services to review his medications. Tr. 617.

A CT scan in September 2004, indicated an increase in the size of his right sided lung nodule, calcified lymph nodes, calcified coronary arteries, and upper right bronchiectasis. McIntosh

had a lung wedge biopsy in December 2004. An initial pathology report appeared to indicate a benign disease. Tr. 543. The final pathology report revealed moderately differentiated invasive adenocarcinoma. The multi-disciplinary pulmonary team recommended further surgery for right thoracotomy, right lower lobectomy, and mediastinal lymph node dissection, followed by an oncology chemotherapy consultation. Tr. 543-545. In January 2005, PMHNP Inaba treated him for depression and PTSD and noted McIntosh had quit smoking and was fearful of recommendations for further lung surgery. Tr. 534.

## II.  RFC Determination

### A. VA Disability Rating.

McIntosh contends the ALJ failed to give proper weight to the VA rating of disability and unemployability. The process for determining disability is very similar in the VA system and the Social Security Disability program. The ALJ is required to give "great weight" to the VA determination of disability. *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002). The ALJ may give less weight to the VA decision "if he gives persuasive, specific, valid reasons for doing so that are supported by the record. *Id.*

The Board of Veterans' Appeals (VA Board), made a decision on October 28, 2002, regarding McIntosh's appeal from a 50 percent service-related disability rating due to Dysthymic Disorder, and on his application for individual unemployability. The VA Board reviewed the medical and employment records and increased McIntosh's service-connected disability rating to 70 percent. It found McIntosh's Dysthymic Disorder was of sufficient severity to prevent him from engaging in substantial gainful employment and thus awarded a 100 percent compensation rating based on unemployability. Tr. 124. The VA has a system of total disability ratings for compensation. "A total disability rating for compensation purposes may be assigned if the schedule

11 - AMENDED OPINION AND ORDER OF REMAND

of ratings equals 100%, or if the combination of disabilities is less than 100%, but the service-connected disabilities are sufficient to produce unemployability." *Moyer v. Derwinski,* 2 Vet. App. 289, 294 (1992). The regulations provide:

> (a)Total disability ratings for compensation may be assigned, where the schedular rating is less than total, when the disabled person is, in the judgment of the rating agency, unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities: *Provided that*, if there is only one such disability, the disability shall be ratable at 60 percent or more. . .

38 C.F.R. § 4.16 (a).

The ALJ stated he gave some weight to VA rating. His rationale for discounting the VA determination is not based on persuasive and valid reasons supported by the record. The ALJ stated the VA regulations allow an individual to work without losing his compensation. Tr. 29. Whether or not this is true, compensation has no bearing on the process of determining disability. As noted by the court in *McCartey,*

> Both programs serve the same governmental purpose-providing benefits to those unable to work because of a serious disability. Both programs evaluate a claimant's ability to perform full time work in the national economy on a sustained and continuing basis; both focus on analyzing a claimant's functional limitation; and both require claimants to present extensive medical documentation in support of their claims.

*McCartey v. Massanari*, 298 F.3d at 1076.

Furthermore, the ALJ statement that "In this case, even the Department of Veteran Affairs concedes that the claimant in only 'likely' unemployable" Tr. 29, mischaracterizes the record. The VA, in fact, found McIntosh was totally unemployable and assigned him a permanent 100 percent disability rating because he was unable to work due to his 70 percent service-connected disability of Dysthymic Disorder. Tr. 124.

The ALJ concluded,

> Because the claimant is able to work without endangering his compensation, in addition to the non-specific determination of the unemployability issue by the Department of Veterans Affairs, plus consideration of all the medical evidence of record and testimony reflected herein, I find the claimant does not meet or medically equally (sic) any of the criteria under the Social Security Administration regulations to warrant a finding that he cannot perform in either his past relevant work or in "other work," existing in significant numbers in the national economy.

Tr. 29. The ALJ's third reason for discounting the VA decision is that it is not consistent with the medical record is also flawed. In discounting the opinion of Dr. Monkarsh, a VA examining psychologist, the ALJ stated at the time of Dr. Monkarsh's examination there was no record of ongoing treatment, medication, or counseling for mental impairment. Tr. 28. This is contrary to the record which indicated McIntosh was on antidepressants and in counseling therapy. Tr. 229-232, 316-322. The ALJ cited the VA decision of February 25, 2002, denying an increase in McIntosh's 50 percent disability rating, as indicative of no change in McIntosh's disability status as of that date. Tr. 28. However, the February 25, 2002, VA decision was successfully challenged by McIntosh and the VA increased his disability rating to 70% and found him unemployable as of August 27, 2001. Tr. 119-123.

The ALJ also gave invalid reasons for discounting McIntosh's PTSD diagnoses. He discounted the May 2002, diagnosis by PMHNP Inaba, noting a nurse practitioner is not a medical source under social security regulations. Tr. 29. However, Dr. Huang co-signed the nurse practitioner's medical notes which include the diagnosis. Tr. 295. The opinion of a nurse practitioner working under the supervision of a treating physician may be counted as part of the physician's opinion. *Gomez v. Chater,* 74 F.3d 967, 971 (9th Cir. 1996).

The ALJ also discounted the diagnosis of PTSD because McIntosh was able to attend PTSD group therapy meetings. Tr. 29, 32. McIntosh was referred to these group sessions by the mental health providers at VAMC. If he did not attend them he would not be following his treatment

13 - AMENDED OPINION AND ORDER OF REMAND

recommendations. *See,* 20 C.F.R. § 404.1530. Regarding the PTSD diagnosis by Dr. Wood, a state agency consulting examiner, the ALJ found opined that "the clinical correlation between paranoia and marijuana abuse is well established which makes his cannabis usage an equally possible cause for his alleged symptomology of PTSD." Tr. 32. It is, however, beyond the role and expertise of the ALJ to make independent medical findings based on generally accepted medical views that are not in evidence. *See* SSR 96-2p.

In summary, the ALJ failed to give adequate reasons for disregarding the conclusions of the Board of Veterans' Appeals that McIntosh is unable to work due to his dysthymic disorder. Noting that this case has previously been reversed by the Appeals Council for further development of the record, I conclude that here, as in *McCartey*, "The record is fully developed and, giving great weight to the VA disability rating, a finding of disability is clearly required." 298 F. 3d 1077.

Because I conclude that the ALJ's errors in evaluating the conclusions of the Board Of Veterans' Appeals, on this record, mandates a finding of disability, I do not address the other objections to the ALJ's decision raised by McIntosh.

## CONCLUSION

Based on the foregoing, the ALJ's decision that McIntosh is not disabled under the Social Security Act is reversed and remanded for an immediate award of benefits pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

DATED this 23rd day of October, 2007.

          /s/ Paul Papak
Paul J. Papak
United States Magistrate Judge